UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ARTHUR ANDERSON,

    Defendant.
    _____/

File No. 1:09-CR-195-03

HON. ROBERT HOLMES BELL

**O P I N I O N**

**I.**

Defendant Arthur Anderson has been charged with two counts related to possession and distribution of heroin and cocaine. (Dkt. No. 37.) Before the Court is Defendant's motion to suppress evidence. (Dkt. No. 58.) Defendant contends that the evidence was obtained improperly because law enforcement officers unreasonably detained him at a traffic stop until a narcotics dog arrived and searched his vehicle.

The Court held an evidentiary hearing on Monday, July 12, 2010. At the hearing, the Court heard testimony from the following police officers of the Kalamazoo Department of Public Safety ("KDPS"): Officer Michael Ferguson, Officer Cory Ghiringhelli, Officer Lisa Moore, Officer Gary Gaudard, and Officer Matthew Elzinga. The Court found these witnesses to be credible based on its observation of their testimony. The government also presented video of the traffic stop, as seen from Officer Ghiringhelli's cruiser. The Court

indicated at the hearing that Defendant's motion would be denied, and this opinion memorializes the Court's findings and its reasons for denying the motion.

## II.

On the June 4, 2009, officers from the KDPS that were members of the Kalamazoo Valley Enforcement Team ("KVET")[1] were conducting surveillance of Defendant Arthur Anderson. A member of the team, Officer Gaudard, had received intelligence from an informant identified as "Tony Scott" that Defendant was involved in drug trafficking activity. Scott told Gaudard that Defendant was a "mule" for "the biggest dealer in Kalamazoo," Winston Owen. Gaudard shared this information with other officers on his team, including Sergeant Boysen, who had heard similar allegations about Defendant in a previous investigation. KVET officers suspected that Defendant was involved in drug trafficking with Owen and another Defendant in this matter, Donald James Hollin. KVET officers had seen Defendant's car parked at Owen's house on a number of occasions, and were aware that Defendant's daughter was married to Owen.

Officer Ferguson was assigned to watch for Defendant at a restaurant in Kalamazoo, Michigan. Near the restaurant, Ferguson identified a Lincoln Town Car similar to one that KVET officers had seen Defendant use on other occasions in their investigation. Ferguson identified the vehicle as a 1997 Lincoln Town Car, but noted that the license plate displayed

---

[1]KVET is comprised of police officers dedicated to eradicating the distribution of illegal drugs in the Kalamazoo area.
*See* http://www.kalamazoocity.org/portal/government.php?page_id=215.

on the vehicle was registered under Defendant's name for a different vehicle, a 1995 Lincoln Town Car.

Around 8:30 am, Ferguson observed Defendant enter the vehicle. He and other KVET officers followed Defendant as he stopped at his house, and a gas station, and then drove north from Kalamazoo on US-131 toward Grand Rapids, Michigan. Defendant drove to 54th Street in Grand Rapids and then to TD Motoring, a car lot on South Division Street.[2] Hollin arrived in another vehicle shortly thereafter and entered Defendant's car. Defendant drove Hollin to an apartment on Waldon Woods Drive in Wyoming, Michigan.[3] Hollin went into the apartment alone and then returned to the vehicle. Defendant then drove with Hollin back toward TD Motoring. Officers lost visual contact with Defendant, and then observed him a short time later driving south on US-131, alone.

Earlier that morning, Officers Ghiringhelli and Elzinga had been assigned to stop Defendant on US-131 on Defendant's return trip to Kalamazoo. Officer Ghiringhelli is a police officer experienced in drug investigations; he has twelve years of experience at KDPS and four and a half years of experience working with KVET.[4] Ghiringhelli was aware that Defendant had traveled from Kalamazoo to Grand Rapids, and Ghiringhelli heard other

---

[2] The Court takes judicial notice that the distance between the City of Kalamazoo and the intersection of South Division Street and 54th Street is approximately forty-five miles.

[3] The Court takes judicial notice that the distance between the intersection of South Division and 54th Street in Grand Rapids to Waldon Woods Drive in Wyoming is approximately six miles.

[4] In other words, at the time of the investigation, Ghiringhelli had been working with KDPS and KVET for eleven and three and a half years, respectively.

3

officers relay their surveillance of Defendant's activities in Grand Rapids, including Defendant's contact with Hollin. Ghiringhelli also heard from other officers that Hollin was a "known drug dealer," and the officers' suspicion that Defendant's vehicle contained drugs or drug proceeds. Ghiringhelli pulled Defendant over at a rest stop south of the "D Ave" exit, near Plainwell, Michigan.

At 9:08[5] on the police video, some time shortly after noon, Defendant's vehicle came to a stop in the parking lot of the rest area, with Ghiringhelli's cruiser parked immediately behind it. At 9:16, Defendant opened his door and stood next to his vehicle. When Officers Ghiringhelli and Elzinga approached Defendant, Defendant turned and moved to reenter his vehicle before Ghiringhelli could identify himself. Officer Elzinga stood in the doorway and prevented Defendant from reentering his vehicle. Officer Ghiringhelli told Defendant about the improper plate.[6] Defendant said that he owned three different Lincoln Town Cars. Ghiringhelli asked Defendant where he had come from, and Defendant initially stated that he had come from Plainwell. Defendant then told Ghiringhelli that he had come from "D&G" funeral home on 28th Street in Grand Rapids.

While speaking with Defendant, Ghiringhelli became aware that a "canine unit" had

---

[5]The Court's time references refer to the time marker on the video presented to the Court. "9:08" signifies that nine minutes and eight seconds has elapsed from the start time. Thus, an event in the video at 12:08 occurred three minutes after an event at 9:08.

[6]The video offered by the government was not accompanied by a sound recording. The Court's findings as to what was discussed between Defendant and the officers are based solely on the witness testimony of Officer Ghiringhelli.

been contacted and was on its way to the scene. One of the officers involved in the investigation, Officer Misner, requested a narcotics-detection dog for the traffic stop. Officer Moore responded "immediately" to this request and arrived at the rest stop approximately twelve to fifteen minutes later. Officer Moore has nine years of experience at KDPS, and her canine, Ori, has been certified and is reliable.

At 11:54, Ghiringhelli took Defendant's license, registration, and proof of insurance and returned to his cruiser to conduct LEIN and SOS searches while Elzinga remained with Defendant next to Defendant's vehicle.

At 15:21, Elzinga asked Defendant for consent to search Defendant's pockets. Defendant consented by holding out his hands and nodding his head. At 15:28, Elzinga discovered two bundles of money in Defendant's pockets.[7] Elzinga returned the money. Elzinga asked Defendant for consent to search his vehicle. Defendant refused, but told Elzinga that officers could search the trunk. At 17:40, Defendant opened his trunk.[8] At 19:20, Elzinga moved Defendant away from the vehicle because Officer Lisa Moore had arrived with the narcotics-detection dog.

At 20:15, Officer Ghiringhelli returned to Defendant's vehicle with a ticket book to verify the VIN number. Ghiringhelli verified the VIN on the dashboard and walked away from the vehicle at 20:53. At 21:48, the dog can be seen approaching the vehicle.

---

[7] Later determined to be approximately $1,000.

[8] The search of the trunk was not shown to the Court, but Officer Ghiringhelli testified that nothing was found.

Ghiringhelli continued to complete the citation process but does not recall whether he ultimately issued a citation.

Officer Moore led her dog around the vehicle, and it alerted on the seam of the driver's side door at 22:55. Believing officers had probable cause to search the vehicle, Officer Moore led the dog inside the vehicle and it alerted on the center console. The dog did not inspect the inside of the driver's side door, however. Officer Moore testified that she mistakenly blocked the dog from reaching the door.

Officers searched the inside the vehicle for approximately thirty minutes without finding any contraband. Officer Moore eventually returned with her dog and at 53:35 it led them to a compartment inside the driver's side door. When the dog scratched the armrest, a "pop-up" compartment opened. Officer Ferguson discovered the heroin inside the compartment at 54:30. Officer Moore used her dog to test the money seized from Defendant. Another officer hid the money near another vehicle, and the dog alerted to its location.

## III.

Defendant argues that the evidence seized at the traffic stop should be suppressed because it is the fruit of an illegal detention. Defendant's motion is denied for the reasons that follow.

**A. Initial Stop**

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809 (1996). Police may initiate a traffic stop based on probable cause that a traffic violation has occurred. *Id*. at 813 (1996). The information available to officers after they identified Defendant's license plate, including its registration and the vehicle on which it was displayed, gave them probable cause to stop Defendant's vehicle for a traffic violation.[9]

Defendant contends that stopping him for the license violation was a pretext because officers followed Defendant for several hours before stopping him. But even if the stop was a pretext, "'the constitutional reasonableness of traffic stops [under the Fourth Amendment does not] depend[ ] on the actual motivations of the individual officers involved.'" *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010) (quoting *Whren*, 517 U.S. at 818). Defendant offers no authority that officers were required to act immediately to stop him. Their visual surveillance of him did not trigger his Fourth Amendment rights because he had no expectation of privacy in activities conducted in plain view. Thus, the initial stop was valid, and the officers' delay in stopping him did not violate his Fourth Amendment rights.

---

[9]Mich. Comp. Laws § 257.256(1) provides, in relevant part, that "A person shall not carry or display upon a vehicle any registration certificate or registration plate not issued for the vehicle or not otherwise lawfully used under this act." *Id.* A violation of this provision is a misdemeanor punishable by imprisonment or fine. Mich. Comp. Laws § 257.256(2).

**B. Detention**

Though the initial stop was valid, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Everett*, 601 F.3d at 488 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In the Sixth Circuit, "'the principles announced in *Terry v. Ohio* apply to define the scope of unreasonable police conduct' during traffic stops." *Id.* (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)). Under the principles of *Terry v. Ohio*, 392 U.S. 1 (1968), to qualify as a reasonable seizure, a stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In other words, "[a]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id*; *see also United States v. Sharpe*, 470 U.S. 675, 682 (1985) (stating that a stop must be "reasonably related in scope to the circumstances which justified the interference in the first place") (quoted in *Everett*, 601 F.3d at 489). The Court must consider whether the scope and duration of the stop was reasonable in light of its purposes. This determination requires consideration of the totality of the circumstances. *Everett*, 601 F.3d at 494. It is the government's burden to justify the seizure.

Defendant contends it was unreasonable to require him to wait until the narcotics-detection dog arrived to conduct the search of his car. He contends that "[i]t should have taken the officer no more than five or ten minutes to write up and give Mr. Anderson a citation, but . . . [a]pproximately twenty minutes passed and then another officer arrived with

8

a narcotics dog and eventually performed a search of the vehicle." (Dkt. No. 58, Def.'s Br. 3.)

The facts of this case are similar to those in *Illlinois v. Caballes*, 543 U.S. 405, 408-09 (2005). In *Caballes*, after the defendant was pulled over for speeding, an officer arrived with a narcotics-detection dog. *Id.* at 406. The officer walked the dog around the car, and while the other officer was in the process of writing the ticket, the dog alerted to the scent of drugs in the vehicle. *Id.* The Supreme Court held that a dog sniff from outside a vehicle "by a well-trained narcotics-detection dog" does not, in itself, infringe a right to privacy, because it does not risk exposing otherwise legitimate activity. *Id*. at 409. Thus, the dog-sniff in that case did not unlawfully expand the scope of the traffic stop. *Id.* at 408-09. The Court stated, however, that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407.

Officer Ghiringhelli was in the process of completing the traffic citation when Officer Moore arrived with the narcotics detection-dog to conduct the search. The dog arrived approximately twelve minutes after the beginning of the stop, when Officer Ghiringhelli was verifying the VIN number on Defendant's vehicle, and the dog alerted to the presence of narcotics approximately two minutes later. Officer Ghiringhelli testified that he was in the process of completing the citation after the narcotics-detection dog arrived. There is no indication in any evidence before the Court that Ghringhelli was not being reasonably

9

diligent in prosecution of the traffic citation, or that officers unreasonably delayed prosecution of the traffic violation in order to allow Officer Moore to conduct the external search of Defendant's vehicle. Thus, the scope and duration of the stop from its initiation until the narcotics dog alerted to drugs in the vehicle was reasonable for purposes of prosecuting the traffic violation.

But even if the officers had unreasonably prolonged their prosecution of the traffic violation in order to wait for the arrival of the narcotics-detection dog, they would have been justified in doing so. Within a few minutes after their first contact with Defendant, officers at the traffic stop had the following information before them: (1) Defendant was a suspect in a drug-trafficking investigation; (2) Defendant made a long journey from Kalamazoo to Grand Rapids for the sole purpose of meeting with a suspected drug dealer and taking him to a nearby location; (3) Defendant changed his story about his travel history; and (4) Defendant twice lied about his whereabouts earlier in the day, first claiming that he was coming from Plainwell, and then claiming that he was coming from a funeral home in Grand Rapids.

Courts have recognized that inconsistent statements to the police at a traffic stop are relevant as a factor justifying a reasonable suspicion. *See United States v. Orsolini*, 300 F.3d 724, 727 (6th Cir. 2002); *see also Weaver v. Shadoan*, 340 F.3d 398, 508 (6th Cir. 2003). Defendant's lies to the officers at the scene were even more telling. Given that officers already suspected that Defendant was involved in drug trafficking based on his activities

earlier in the day, his attempt to conceal those activities from the police immediately after he was stopped tended to confirm those suspicions. *See Weaver*, 340 F.3d at 408 (noting that "[l]ying about travel plans can also form a basis for reasonable suspicion"). Considering the totality of the circumstances, the foregoing facts were sufficient to support a reasonable, articulable suspicion that Defendant was involved in criminal activity.

Defendant's interaction with Elzinga further supported the officers' suspicions: Defendant consented to a search of his trunk but not the rest of his car, and then several bundles of money were found in Defendant's pocket, consistent with officers' suspicions that Defendant was in possession of drug proceeds.

Given the officers' reasonable suspicion of Defendant's involvement in drug trafficking, fourteen minutes from the start of the stop until the narcotics-detection dog arrived and alerted to narcotics in his vehicle was not an unreasonable period of time for Defendant to wait for officers to confirm or dispel their suspicions with the search by the narcotics dog.

There is no evidence of unreasonable delay on the part of the officers in obtaining the assistance of the narcotics-detection dog. Officer Moore was called to the scene within minutes after the stop was initiated, and she testified that she responded immediately, arriving within twelve to fifteen minutes.[10] By comparison, in *Orsolini* the defendant was detained for almost an hour before the narcotics-detection dog arrived and alerted to the

---

[10]The Court takes judicial notice of the fact that the rest stop on US-131, south of D Ave, is located approximately eight miles outside the city of Kalamazoo.

presence of narcotics, including over half an hour of delay solely attributable to waiting for the dog to arrive. 300 F.3d at 730; *see also United States v. West*, No. 08-6230, 2010 WL 1324221 (6th Cir. Apr. 6, 2010) (noting in that case that calling for a canine unit was the "least intrusive means available to verify or dispel [the officer's] suspicion" of the presence of narcotics during a traffic stop) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

In his reply, Defendant cites *United States v. Blair* 524 F.3d 740 (6th Cir. 2008), in which the court assumed that an officer had probable cause to stop the defendant for a traffic violation, but concluded that he unreasonably expanded the scope of the stop because he did not have reasonable suspicion of criminal activity. *Id.* at 752. The defendant had been witnessed by an undercover officer engaging in what was believed to be a hand-to-hand drug transaction in a known drug house. After the defendant's car left the house, the undercover officer requested another officer to stop the car, but the officer making the stop had not seen the car leave the house, and he was not certain that he was stopping the right vehicle. The defendant immediately exited his car and showed signs of nervousness, according to the officer, including reaching under the seats of the car. *Id.* at 752-53. After verifying the defendant's registration, the officer proceeded to ask the defendant for permission to search the vehicle, which was refused. Then the officer told the defendant that he could order a canine unit to search the vehicle. *Id.* The court held that at this point the officer had extended the traffic stop beyond its original purpose, and the remainder of the stop violated the Fourth Amendment. *Id.* According to the court, the totality of the circumstances,

including the defendant's nervous behavior, did not give rise to a reasonable suspicion of criminal activity. *Id.* at 753. *Blair* is distinguishable because Officer Ghiringhelli was in the process of verifying Defendant's information when the canine unit arrived. He had not completed the purpose of the traffic stop.

Moreover, unlike the officer in *Blair*, Ghiringhelli had sufficient information to support a reasonable suspicion to wait for the narcotics-detection dog to complete its search. The facts in this case supporting that suspicion exceed the facts available to the officer in *Blair*. The officer in *Blair* attempted to justify his suspicions on the nervousness of the defendant, because he was not certain that he was stopping the right vehicle. In contrast, there is no question that Officer Ghiringhelli correctly identified Defendant's vehicle, and could therefore rely on all the facts learned through surveillance of Defendant earlier that day, as well as Ghiringhelli's own observations at the traffic stop.

Defendant also cites *United States v. Bonilla*, 357 F. App'x 693 (6th Cir. 2009), in which an officer made a traffic stop because the defendant was following too closely to another car. *Id.* at 694. The officer asked the defendant to exit the car for a "pat down" in the course of asking him some questions. *Id.* The officer decided that the defendant's story did not make sense, and returned to his cruiser to check the defendant's license and to call for backup so that he could have a dog to conduct a "free-air sniff" of the vehicle. *Id.* When the backup officers arrived, approximately twenty minutes later, the officer ceased preparing his ticket, removed the defendant from the vehicle, and placed him and the passenger in

13

separate patrol cars. The officer then walked the narcotics dog around the vehicle and the dog alerted to the scent of drugs at 4:25 pm. The court held that the officer's actions exceeded the scope of the traffic stop at the time he stopped writing the citation and placed the defendant and passenger in separate patrol cars so that he could walk the dog around the vehicle. *Id.* at 697. The court held that, at this point, the officer needed reasonable suspicion to continue to detain defendant, which he did not have. *Id.* at 699.

*Bonilla* is distinguishable because there is no indication that Officer Ghiringhelli or Officer Elzinga meaningfully departed from the purpose of the traffic stop in order to investigate the presence of narcotics in Defendant's vehicle. Moreover, even if they had, they were justified in doing so based on their reasonable suspicion of Defendant's involvement in drug trafficking. Though the court in *Bonilla* was not satisfied that the officer in that case had reasonable suspicion of the presence of contraband in the defendant's car, the facts available to Officer Ghiringhelli, including Defendant's contact with a suspected drug dealer and his attempt to conceal that activity by lying about his whereabouts, provided a much stronger basis for reasonable suspicion than the facts in *Bonilla*.

**IV.**

For the foregoing reasons, therefore, Defendant's motion to suppress is denied. An order will be entered that is consistent with this opinion.


Dated: July 19, 2010                                   /s/ Robert Holmes Bell
                                                       ROBERT HOLMES BELL
                                                       UNITED STATES DISTRICT JUDGE